

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-31-1999

# Bald Eagle Area School Dist. v. Keystone Financial, Inc.

Precedential or Non-Precedential:

Docket 99-3119

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Bald Eagle Area School Dist. v. Keystone Financial, Inc." (1999). *1999 Decisions*. Paper 243.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/243

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 31, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3119

BALD EAGLE AREA SCHOOL DISTRICT; SOUTH BUTLER
COUNTY SCHOOL DISTRICT, School Districts of the
Third Class, Individually and on behalf of all others
similarly situated,

v.

KEYSTONE FINANCIAL, INC., a Bank Holding Company;
MID-STATE BANK & TRUST CO., a Pennsylvania Bank
and Trust Company; WILLIAM H. BOGEL;
NANCY F. FOGEL; ROBERT LEECH;
ROBERT R. MAGILL, individuals

       BALD EAGLE AREA SCHOOL DISTRICT and
       SOUTH BUTLER COUNTY SCHOOL DISTRICT,
       individually and on behalf of all others
       similarly situated,

       Appellants

Appeal from the United States District Court for
the Western District of Pennsylvania
Civil Action No. 98-cv-00930
District Judge: Hon. Donetta W. Ambrose

Argued: July 29, 1999

Before: SCIRICA and McKEE, Circuit Judges, and
BROTMAN, Senior District Judge*

(Filed: August 31, 1999)
_____

*The Honorable Stanley S. Brotman, Senior United States District Judge
for the District of New Jersey, sitting by designation.

RICHARD A. FINBERG, ESQ.
  (Argued)
RUDY A. FABIAN, ESQ.
Malakoff, Doyle & Finberg, P. C.
The Frick Building, Suite 200
Pittsburgh, PA 15219

RICHARD R. NELSON, II, ESQ.
NANCY HEILMAN, ESQ.
Cohen & Gribsby, P. C.
11 Stanwix Street, 15th Floor
Pittsburgh, PA 15222
Attorneys for Appellants

ANDREW B. WEISSMAN, ESQ.
  (Argued)
CHARLES E. DAVIDOW, ESQ.
WILLIAM K. SHIREY, ESQ.
Wilmer, Cutler & Pickering
2445 M Street, N. W.
Washington, D. C. 20037

WILLIAM M. WYCOFF, ESQ.
MICHAEL H. WOJCIK, ESQ.
One Riverfront Center
Pittsburgh, PA 15222
Attorneys for Appellees

OPINION OF THE COURT

McKEE, Circuit Judge.

Bald Eagle Area School District and South Butler County School District filed a putative class action complaint asserting, inter alia, four claims against Keystone Financial, Inc., Mid-State Bank & Trust Co., and certain named individuals under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U. S. C. S 1962, by which they sought to recover approximately $70 million that they lost as a result of a Ponzi scheme. The District Court, concluded that S 107 of the Private Securities Litigation Reform Act of 1995 ("PSLRA") amended RICO so as to preclude the School Districts' civil RICO action, and

2

dismissed the complaint under Fed. R. Civ. P. 12(b)(6). For the reasons that follow, we will affirm.

I.

Various school districts, municipalities and other governmental units were purported victims of a Ponzi scheme[1] run by John Gardner Black through his

_____

1. Ponzi schemes take their name from Charles Ponzi. Following the collapse of his fraudulent investment scheme, a number of investors began lawsuits to recover their investments. Some litigation ultimately reached the Supreme Court, which described the operation of Ponzi's fraudulent investment scheme.

> The litigation grows out of the remarkable criminal career of Charles Ponzi. In December, 1919, with a capital of $150, he began the business of borrowing money on his promissory notes. He did not profess to receive money for investment for account of the lender. He borrowed the money on his credit only. He spread the false tale that on his own account he was engaged in buying international postal coupons in foreign countries and selling them in other countries at 100% profit, and that this was made possible by the excessive differences in the rates of exchange following the war. He was willing, he said, to give others the opportunity to share with him this profit. By a written promise in 90 days to pay them $150 for every $100 loaned, he induced thousands to lend him. He stimulated their avidity by paying his 90-day notes in full at the end of 45 days, and by circulating the notice that he would pay any unmatured note presented in less than 45 days at 100% of the loan. Within eight months he took in $9,582,000, for which he issued his notes for $14,374,000. He paid his agents a commission of 10%. With the 50%. promised to lenders, every loan paid in full with the profit would cost him 60%. He was always insolvent, and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.

Cunningham v. Brown, 265 U.S. 1, 7-8 (1924). Nowadays, "[a] `Ponzi' scheme is a term generally used to describe an investment scheme which is not really supported by any underlying business venture. The investors are paid profits from the principal sums paid in by newly attracted investors. Usually those who invest in the scheme are promised large returns on their principal investments. The initial investors are indeed paid the sizable promised returns. This attracts additional

companies: Devon Capital Management2 ("Devon") and Financial Management Services, Inc.3 ("FMS") (hereinafter collectively referred to as "Devon."). The various local government units appointed Devon to act as their investment advisor for the proceeds of bonds, loans and other revenues. On September 26, 1997, the Securities and Exchange Commission obtained a freeze of all assets under the control of Devon. The original SEC action has been closed and a number of the investors have received only a small fraction of their original investments. Certain of the investors then began an involuntary bankruptcy action against Black, Devon and FMS and that action has halted any other litigation in which Black, Devon and FMS were named as defendants.

Bald Eagle Area School District and South Butler County School District (hereinafter "School Districts") were among Black's clients. From 1990 to 1997, they retained Devon as their investment advisor for the investment of proceeds from bonds sold to finance school construction. The School Districts entered into a series of Investment Advisory Agreements with Devon pursuant to which Devon would invest bond proceeds on their behalf and distribute funds

_____

investors. More and more investors need to be attracted into the scheme so that the growing number of investors on top can get paid. The person who runs this scheme typically uses some of the money invested for personal use. Usually, this pyramid collapses and most investors not only do not get paid their profits, but also lose their principal investments." Mark A. McDermott, Ponzi Schemes and the Law of Fraudulent and Preferential Transfers, 72 Am. Bankr. L. J. 157, 158 (1998).

2. Devon was a Maryland corporation started by Black in 1989, with its principal place of business in Tyrone, Pennsylvania. Devon was registered with the SEC as an investment advisor. It was not registered with the SEC as a broker or dealer of securities. Complaint at P 23. Black was the president, portfolio manager and sole shareholder of Devon. SEC v. Black, 163 F.3d 188, 191 n.1 (3d Cir. 1998).

3. FMS was formed by Black in 1992 and began operations in 1993. It was not registered as an investment advisor or broker or dealer of securities. Its principal place of business was also in Tyrone, Pennsylvania. Complaint at P 24. Black is the sole owner of FMS, which is a Pennsylvania corporation. SEC v. Black, 163 F.3d at 191 n.1.

4

as they were needed to pay construction costs. The Investment Advisory Agreements gave Devon discretion to invest in securities authorized by law but provided that Devon would not take possession of, or act as custodian for, the cash, securities or other assets of the School Districts. Instead, the Investment Advisory Agreements provided for Devon's appointment of a custodian for the accounts in which the School Districts' assets were held. Pursuant to the Investment Advisory Agreements, Devon entered into a Custodian Agreement with Mid-State Bank & Trust Co. Under the Custodian Agreement, Mid-State was to maintain custody of the School Districts' assets, which were at all times to be 100% secured by collateral. Chief among Mid-States' duties under the Custodian Agreement was implementation of securities investment decisions made by Devon as the School Districts' investment advisor. Essentially, Mid-State acted as the intermediary which processed the securities trades that were directed by Devon. Its specific obligations under the Custodian Agreement included receiving funds for investment from Devon's clients, executing securities transactions with these funds based on instructions from Devon, executing further purchases and sales of securities held in the custodial accounts based on instructions from Devon; collecting and crediting all payments received on the securities, including dividends, interest, or principal payments; and providing monthly account statements of the assets held in each custodial account.

From 1990 through 1993, the relationship between Devon and the School Districts was lucrative. However, starting in 1993, in response to competitive pressures in the marketplace, Devon sought ways to get a better return on the funds entrusted to it. One way Devon attempted to earn better returns was by purchasing riskier investments, including volatile derivative securities.

To facilitate the purchase of the riskier investments, Devon directed Mid-State beginning in mid-1994 to invest a portion of the clients' funds in Collateralized Investment Agreements ("CIAs") issued by FMS.4  The CIAs had varying

_____

4. FMS and Mid-State entered into a Custodian Agreement on May 10, 1993, pursuant to which Mid-State agreed to perform custodian and other duties similar to those created by the Custodian Agreement between Devon and Mid-State.

fixed income returns, but they all required that FMS maintain collateral equal to 100% of the principal amount invested. Each CIA had a fixed maturity date and a demand element permitting the School Districts to request repayment before the maturity date. FMS pooled the funds from the sale of the CIAs, invested them in risky securities and used those securities as collateral for the CIAs.

Pursuant to Devon's instructions, Mid-State sold securities in Devon's client accounts and purchased CIAs issued by FMS. Following the placement of the CIAs in client accounts, Mid-State continued to provide monthly account statements for Devon clients as required by the Custodian Agreement. The statements reported the transactions in the accounts, including deposits, withdrawals and interest earned. The CIAs were reported in the statements as cash equivalents with current value equal to the principal amount owed by FMS.

However, FMS began to suffer large trading losses in the risky derivative investments in its collateral account. Other losses resulted from Black's misuse of assets held as CIA collateral and his transfer of CIA collateral to other Devon advisory clients for less than full value. By early 1995, the collateral in the FMS accounts was approximately $56 million less than FMS' liabilities under the CIAs. Nevertheless, pursuant to Devon's instructions, FMS continued to sell and repurchase its CIAs at face value. Consequently, Devon permitted its clients to redeem their CIAs at full price even though the value of the underlying collateral had plummeted, while at the same time Devon (through instructions to Mid-State) helped fund these redemptions with new sales of CIAs at full face value. In the aggregate, between June 1994 and September 1997, Mid-State, at Devon's direction, purchased and sold hundreds of millions of dollars of CIAs for the account of Devon clients for whom Mid-State had custodial accounts. These transactions were all for the face value of the CIAs regardless of the value of the securities in FMS' CIA collateral accounts. The purchases and sales between FMS and Devon's clients continued until the SEC revealed on September 26, 1997, that the Devon CIA investment program was a securities fraud.

6

Thereafter, the SEC commenced a civil action against
Black, Devon and FMS alleging that they had perpetrated a
massive Ponzi scheme through the purchase and sale of the
CIA securities in violation of S 10(b) of the Securities
Exchange Act of 1934, SEC Rule 10b-5, and other
provisions of federal securities law. The SEC alleged that
Devon continued to accept new funds from investment
advisory clients for purchases of CIAs without disclosing
that, as a result of the shortfall in the collateral for the
funds already invested in those securities, any new funds
invested would immediately diminish in value by as much
as 45 percent. The SEC further alleged that the Devon
advisory clients who had invested in the CIA program had
suffered a combined loss of their principal investment of
approximately $71 million. On December 12, 1997, the
District Court issued an injunction against Black, Devon
and FMS barring future violations of securities law
including S 10(b), and Rule 10b-5.

II.

On May 27, 1998, the School Districts filed this putative
class action asserting four RICO claims, and seeking to
recover the $70 million lost as a result of the Ponzi scheme.
Counts 1 through 3 assert claims for violations of 18 U.S.C.
S 1962(c).5 The predicate acts are alleged to consist of wire,

_____

5. 18 U.S.C. S 1962 provides:

>       (a) It shall be unlawful for any person who has received any income
>       derived, directly or indirectly, from a pattern of racketeering activity
>       or through collection of an unlawful debt in which such person has
>       participated as a principal within the meaning of section 2, title 18,
>       United States Code, to use or invest, directly or indirectly, any part
>       of such income, or the proceeds of such income, in acquisition of
>       any interest in, or the establishment or operation of, any enterprise
>       which is engaged in, or the activities of which affect, interstate or
>       foreign commerce. A purchase of securities on the open market for
>       purposes of investment, and without the intention of controlling or
>       participating in the control of the issuer, or of assisting another to
>       do so, shall not be unlawful under this subsection if the securities
>       of the issuer held by the purchaser, the members of his immediate
>       family, and his or their accomplices in any pattern or racketeering

mail and bank fraud. Count 4 asserts a claim for conspiracy to violate S 1962(c). In addition, the complaint asserts six state law claims. The complaint named Mid–State, Keystone Financial, Inc., (Mid–State's corporate parent); William H. Bogel, Senior VP and Director of Trust Department at Mid–State; Nancy F. Fogel, VP, Trust Officer and Head of Operations for Mid–State; Robert Leech, Director of Trust Services for Keystone; and Robert R. Magill, VP and Head of Trust Operations for Keystone (hereinafter collectively referred to as "Mid–State") as defendants.6

The Ponzi scheme is the foundation of this complaint. The School Districts allege that Mid–State knowingly participated in, and furthered, the Ponzi scheme through numerous acts of mail, wire and bank fraud. The School Districts' theory is that Mid–State's role in the Ponzi scheme

_____

activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

6. As noted, Keystone is Mid–State's corporate parent. Keystone, through its division known as Keystone Financial Trust Operations ("KFTO") maintained central trust accounting functions for Mid–State and other Keystone subsidiaries. Among other things, KFTO processed and accounted for trades, and posted income and other transactions for Mid–State, Devon and FMS. KFTO also prepared and printed account statements for the trust and custodian accounts of its subsidiaries, including Mid–State.

was essential to the scheme's existence and continuation. Mid-State accepted deposits into custodian accounts and those funds were exchanged for CIAs, by which FMS promised to repay the funds with earnings. Bald Eagle and South Butler allege not only that Mid-State acted as a "back office" for Devon and FMS, but also that the Ponzi scheme could not have operated without Mid-State's participation. That argument is based upon the assertion that the putative class members' funds could be held only in custodian accounts and had to be fully secured. Plaintiffs also allege that although Mid-State was well aware of the shortfalls in the FMS collateral accounts, Mid-State seized upon the volatility of the investments as a means of recovering the losses in hope of limiting its own liability. Plaintiffs further allege that, at the same time, Mid-State took affirmative steps to conceal the scheme by knowingly preparing trust statements which falsely inflated the market values of the investments despite knowing that the collateral was grossly insufficient. The School Districts contend that whenever funds were requested by Devon clients, Mid-State paid out the full amount requested even though there was insufficient collateral to pay all putative class members and other clients.

The School Districts also allege that Mid-State gave a false explanation to the FDIC and other bank regulators to explain the collateral shortfall, and that Mid-State received a cash flow projection from Black which indicated that FMS would be in full balance by November of 1998. However, according to plaintiffs, Mid-State knew that Black's projection required, among other things, the receipt of an additional $330 million of custodian funds between March 1996 and November 1998 -- i.e., Mid-State knew that in order for FMS to be in full balance as projected by Black, the Ponzi scheme needed to be continued.

On August 10, 1998, Mid-State moved to dismiss the School Districts' civil RICO claims under Fed. R. Civ. P. 9(b) and 12(b)(6). Mid-State asserted that (1) the civil RICO action was barred by S 107 of the PSLRA; (2) the complaint was not supported by adequate averments of fraud as required by Fed. R. Civ. P. 9(b); (3) the alleged predicate acts were not the proximate cause of the School Districts'

injuries; and (4) the complaint failed to satisfy other required elements for civil RICO claims. On February 9, 1999, the District Court held that S 107 of the PSLRA barred the School Districts' civil RICO claims, and granted Mid-State's motion to dismiss. The court did not discuss the other grounds for dismissal advanced by Mid-State, and the District Court declined to exercise supplemental jurisdiction over the School Districts' state law claims. This appeal followed.[7]

III.

Prior to 1995, a private plaintiff could assert a civil RICO claim for securities law violations sounding in "garden variety" fraud.. See Sedima S.P.R.L. v. Imrex Co., Inc., 473 U. S. 479, 504-505 (1985)(Marshall, J., dissenting). Inasmuch as "fraud in the sale of securities" was a predicate offense in both criminal and civil RICO actions, Id. at 504, plaintiffs regularly elevated fraud to RICO violations because RICO offered the potential bonanza of recovering treble damages. However, in 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 104-67, 109 Stat. 737 (1995). The PSLRA amended RICO by narrowing the kind of conduct that could qualify as a predicate act. Section 107 of the PSLRA (known as the "RICO Amendment") amended 18 U.S.C. S 1964(c), to provide in relevant part as follows:

> Any person injured in his business or property by reason of a
> violation of section 1962 of this chapter may sue therefor in any
> appropriate United States District Court and shall recover threefold
> the damages he sustains and the cost of the suit, including a
> reasonable attorney's fee, except that no person may rely upon any

_____

7. "Whether the District Court properly dismissed the . . . complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a RICO claim is subject to plenary review, and we apply the same standard as the District Court. We construe the complaint liberally and take all material allegations as admitted. All reasonable inferences are drawn in favor of the plaintiffs. We will not affirm the dismissal unless the plaintiffs could prove no set of facts that would entitle them to relief." University of Maryland at Baltimore v. Peak, Marwick, Main & Co., 996 F.2d 1534, 1537-38 (3d Cir. 1993)(citations omitted).

10

conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. S 1964(c)(emphasis added).

The Conference Committee Report accompanying S 107 states that the amendment was intended not simply "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." H. R. Conf. Rep. No. 104–369, at 47 (1995).

We recently held that S 107 eliminated "any conduct actionable as fraud in the purchase or sale of securities" as a predicate act for a private cause of action under RICO. Mathews v. Kidder, Peabody & Co., Inc., 161 F.3d 156, 157 (3d Cir. 1998).[8] We stated that the legislative history shows that Congress enacted the RICO Amendment "to address a significant number of frivolous actions based on alleged securities law violations." Id. at 164 (quoting 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995)(statement of Rep. Cox)). The "focus" of the Amendment was on "completely eliminating the so-called `treble damage blunderbuss of RICO' in securities fraud cases." Id. (quoting 141 Cong. Rec. H2771).

Here, careful examination of the School Districts' complaint discloses the District Court correctly concluded that the School Districts' Civil RICO Action is barred by S 107. In the SEC's civil action against Black, Devon and FMS, the SEC has alleged that a massive Ponzi scheme was perpetrated through the purchase and sale of CIAs in violation of the securities laws including S 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b–5 and other provisions of the securities law. SEC Complaint, App. at 523–39. That same Ponzi scheme is at the heart of this RICO action. Plaintiff's allegations include the following:

_____

8. In Mathews, we held that the RICO Amendment does not apply retrospectively, i.e., "it does not apply to cases pending at the time the [PSLRA] was enacted." 161 F.3d at 171.

11

P 3. Bald Eagle and South Butler bring this class action under . . . [RICO] . . . to recover their losses caused by [Mid-States'] participation in an elaborate, but carefully concealed municipal fraud of immense magnitude, that ultimately became nothing more than an old-fashioned Ponzi Scheme. . . .

P 4. The Ponzi scheme was revealed publicly on September 26, 1997, when the Securities and Exchange Commission ("SEC") commenced a civil enforcement action . . . against . . . [Black, Devon and FMS] . . . . As detailed in the SEC's enforcement action, Black illegally perpetrated such a scheme upon . . . [the School Districts and other class members] . . . causing them to lose approximately $70,000,000. However, Black could not conduct this scheme alone, and, in fact, [Mid-State] joined and participated in such scheme through multiple acts of bank, mail and wire fraud, . . . .

Plaintiffs allege that Mid-State joined, assisted and participated in Black's Ponzi scheme:

P 5. [A]lthough Black's Ponzi scheme wasfirst revealed publicly in September 1997, [Mid-State] discovered it years before the SEC uncovered it. Rather than reveal the scheme, and put a stop to it, however, [Mid-State] joined in the scheme and enabled it to continue in the hope that Black could recover his massive losses and, more importantly, thereby avoid any claims against [Mid-State](emphasis in original) . . . .

P 94. [Mid-State] ignored [its] obligations to class members because [it] became embroiled in, and participated in, a Ponzi scheme that depended upon the unauthorized pooling of class members' funds, the investment of those funds in risky, impermissible investment, the fraudulent reporting of market values, and the infusion of more money to keep the scheme going. . . .

P 95. [B]ecause neither Devon nor FMS were licensed as a broker or dealer in securities, Black used Mid-State . . . as the "back office" for Devon. In this capacity, Mid-State . . . essentially acted as the

12

intermediar[y] which processed the securities trades
that were directed by Black. . . .

P 126. [Mid-State], whose role[ ], inter alia, custodian
and "back office," [was] essential to Black's Ponzi
scheme, had by now knowingly joined the scheme as
participant[ ]. . . .

P 133. Because bond proceeds and certain other funds
of school districts and other governmental units can
only be deposited with custodian banks, such as [Mid-
State], it was impossible for Black to continue his Ponzi
scheme, once disclosed and fully understood, without
the knowing participation and assistance of [Mid-
State]. Rather than stop this fraud, however, and
fearing that [Mid-State] would be liable for tens of
millions of dollars of past losses, and that individual
Defendants' jobs and careers were in jeopardy, [Mid-
State] elected not to reveal the Ponzi scheme, but
rather, to join, assist, and continue it.

These few excerpts demonstrate, in the School Districts'
own words, that Mid-State's "role in the Ponzi scheme was
essential to its existence and continuation." Appellants' Br.
at 8. The School Districts allege that Black's Ponzi scheme
was securities fraud. We, like the District Court, must
accept these allegations as true for purposes of a motion to
dismiss under Rule 12(b)(6)[9] University of Maryland v. Peak,
Marwick, Main & Co., 996 F.2d 1534, 1537-38 (3d Cir.
1993). Therefore, the alleged conduct is "conduct that
would have been actionable as fraud in the purchase and
sale of securities," S 107 PSLRA, and it cannot constitute
predicate acts of a RICO violation. Accordingly, it is clear
that the RICO action is barred by S 107.

_____

9. In its opinion, the District Court, while reciting that Mid-State had
filed a motion to dismiss, recited the standards for granting summary
judgment under Fed. R. Civ. P. 56. However, it is clear from reading the
opinion that the District Court was conducting a 12(b)(6) analysis.
Further, the parties to this appeal acknowledge that it was a 12(b)(6)
motion. See, e.g., Mid-States' Br. at 5 n.1 ("For purposes of this appeal
appellees accept the allegations in the complaint as true but do not
otherwise concede their accuracy.").

13

The School Districts attempt to avoid the unavoidable by arguing here, as they did before the District Court, that the challenged conduct "does constitute bank fraud, wire fraud and mail fraud, but does not constitute securities fraud." Appellants' Br. at 11-12 (emphasis in original). However, they also concede that some of the conduct alleged as predicate offenses of mail, wire, and bank fraud does constitute securities fraud. See Reply Br. at 28 ("The District Court correctly stated that `the issue before me appears to be whether the RICO amendment bars an action where only some of the predicate acts would have been actionable as [securities] fraud.") Plaintiffs assert that if only some of the conduct alleged is securities fraud, then "obviously some other portion of [Mid-State's] conduct is not actionable as securities fraud." Id. And, it is this "other portion" of Mid-State's conduct which the School Districts argue constitutes the predicate offenses of mail, wire and bank fraud.

The School Districts submit that the "other portion" of the conduct consists of "obtaining deposits of funds, failing to maintain collateral, failing to maintain custody of funds, paying out more funds to withdrawing clients than the fair value of their account, providing false trust statements (after deposits are obtained), and lying to bank regulators." School Districts' Br. At 12 (emphasis in original).

The School Districts' position ignores two significant and intertwined facts. First, as noted earlier, the RICO Amendment removed securities fraud as a predicate offense in a civil RICO action. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. S 78j(b), 10 and SEC Rule

_____

10. Section 10(b) provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange --

          ******************************

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

14

10b-5, 17 C.F.R. S 240.10b-5,11 are directed at fraud "in connection with the purchase or sale" of securities. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 733 (1975) (emphasis added). The School Districts' position ignores the reality that the same set of facts can support convictions for mail fraud, wire fraud, bank fraud and securities fraud without giving rise to any multiplicity problems. See United States v. Faulhaber, 929 F.2d 16 (1st Cir. 1991) and United States v. Reed, 639 F.2d 896 (2d Cir. 1981). Each of those offenses requires proof of a fact which the others do not. See Blockburger v. United States, 284 U. S. 299 (1932). Consequently, a plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud. Allowing such surgical presentation of the cause of action here would undermine the congressional intent behind the RICO Amendment. Second, the contention that the conduct alleged as predicate offenses was not in connection with the purchase or sale of securities completely ignores the hard reality that the conduct was an integral part of Black's securities fraud Ponzi scheme. A Ponzi scheme is ongoing, and it continues only so long as new investors can be lured into it so that the early investors can be paid a return on their "investment." Consequently, conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities. For

---

11. SEC Rule 10b-5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

15

example, the CIAs purchased by the School Districts were worth significantly less than their purchase price because of the shortfall in the collateral in the funds already under management. However, it is alleged that Mid-State either misrepresented, or failed to disclose, the collateral shortfall in account statements it prepared. This misrepresentation/omission, induced new investments. Such conduct may well constitute wire, mail or bank fraud, but it was also undertaken in connection with the purchase of a security. Thus, it cannot support a civil RICO claim after enactment of the PSLRA.

The District Court held that the RICO Amendment barred the School Districts' civil RICO action because the conduct underlying the RICO claims is "intrinsically connected to, and dependent upon conduct which would be actionable under Federal securities law." Dist. Ct. Op. at 13. But, the proper focus of the analysis is on whether the conduct pled as predicate offenses is "actionable" as securities fraud -- not on whether the conduct is "intrinsically connected to, and dependent upon" conduct actionable as securities fraud. Because the District Court appeared to center its attention on whether the conduct alleged as predicate offenses was connected to and dependent upon securities fraud, rather than on whether the conduct was actionable as securities fraud, the School Districts argue that the District Court gave an "overly expansive" reading to the RICO Amendment. Appellants' Br. at 11. However, on a close reading of the District Court's opinion, it is clear that the District Court's analysis was properly focused on whether the conduct was actionable as securities fraud. The tenor of the opinion demonstrates that the District Court found the conduct alleged as predicate acts was so closely connected to and dependent upon conduct undertaken in connection with the purchase or sale of securities that it was actionable as securities fraud. Consequently, we find no merit in the School Districts' argument that the District Court's reading of the RICO Amendment was overly expansive.

IV.

For the above reasons, we will affirm the decision of the District Court.

16

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

17