Kristoff **GINTOWT,**

v.

**TL VENTURES, et al.**

**Civil Action No. 02–746.**

United States District Court, E.D. Pennsylvania.

Oct. 3, 2002.

Donald B. Lewis, Law Offices of Donald B. Lewis, Bala Cynwyd, PA, for Plaintiff, Kristoff Gintowt.

Thomas E. Zemaitis, Jeffrey K. Techentin, Pepper, Hamilton & Scheetz, Norman E. Greenspan, Blank, Rome, Comisky & McCauley, LLP, Philadelphia, PA, Charles E. Talisman, Ronald S. Liebman, Andrew M. Friedman, Patton, Boggs, LLP, Washington, DC, for Defendants, TL Ventures, et al.

### *MEMORANDUM*

BAYLSON, District Judge.

Plaintiff Kristoff Gintowt has filed a Complaint asserting violations of the Rack-

eteer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961–68, against all Defendants. Presently before this Court is a motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), by Defendants TL Ventures, TL Ventures III L.P., TL Ventures III Offshore L.P., TL Ventures III LLC, TL Ventures III Interfund L.P., TL Ventures Management L.P., Arthur Spector and James Dixon. The Motion will be GRANTED, with leave to Plaintiff to file an amended complaint.

## I. Legal Standard on Rule 12(b)(6) Motion to Dismiss

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments. *See Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The court must accept as true all well pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *See Angelastro v. Prudential–Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.1985). A Rule 12(b)(6) motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff. *See Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

## II. Allegations of the Complaint

Plaintiff alleges the following facts, which, for the purpose of deciding the instant motion, will be read in the light most favorable to Plaintiff. The Reohr Group Inc. (herein "Reohr"), a successful staffing company, was a closely-held corporation, whose shares were entirely owned by Plaintiff and two other individuals (herein "the Reohr partners"). *See* Complaint ¶ 11. In October 1997 Reohr

merged into a new company, Broadreach Consulting, Inc. ("Broadreach"). As explained below, Plaintiff claims that his equity in Broadreach was obliterated as a result of numerous acts of fraud, which were concealed from Plaintiff (and others), as well as various misrepresentations by Defendants.

Defendant TL Ventures (herein "TL") was a venture capital fund ("VCF"), which managed other VCFs and offered shares in those VCFs to the public. *Id.* ¶ 5. TL was "closely affiliated" with Safeguard Scientifics, Inc. ("Safeguard"). *Id.* Defendants TL Ventures III L.P. ("Ventures III"), TL Ventures III Offshore L.P. ("Offshore"), TL Ventures III LLC, and TL Ventures III Interfund L.P. ("Interfund") were also VCFs affiliated with Safeguard. *Id.* ¶ 6. Yet another entity, TL Ventures Management L.P., was the General Partner of the other TL entities (herein "TL Defendants"). Information Technology Consulting Inc. ("ITC") was a subsidiary of HDS Network Systems, Inc. ("HDS"). *¶Id.* ¶ 7. HDS was eventually renamed Neoware Systems, Inc. ("Neoware").[1] *Id.* Defendant Arthur Spector was managing director of TL Ventures Management L.P. and CEO of HDS. *Id.* Defendant James Dixon was CEO of Broadreach. *Id.* ¶ 8. Plaintiff alleges that Dixon and Spector, at all times, acted on behalf of Neoware and the TL Defendants. *Id.* Defendant Rice Sangalis Toole & Wilson ("Rice") was an investment firm, while Defendant RSTW Partners, III L.P. ("RSTW") was a limited partnership created by Rice for the purpose of acquiring an interest in Reohr.[2] *Id.* ¶ 9–10.

According to Plaintiff, in July 1996 Spector approached the Reohr partners, representing that the TL Defendants were interested in making an equity investment

---

**1.** Defendant Neoware has been dismissed from this litigation.

**2.** Rice and RSTW have been dismissed from this litigation.

in Reohr. *See* Complaint at ¶ 14–15. In the fall of 1996, Spector tendered proposals by the TL Defendants to purchase all of Reohr's assets. *Id.* ¶ 16. Spector represented that the TL Defendants intended to acquire several successful companies and combine them into a single staffing company, Broadreach. *Id.* ¶ 17. Dixon represented to the Reohr partners, via telephone, that the three Reohr partners would each have a seat on the Broadreach board. *Id.* ¶ 34. Dixon also faxed unspecified "documents related to the completion of the merger." *Id.* On October 2, 1996 and November 18, 1996, Spector sent letters to the Reohr partners confirming that the "companies to be acquired in the initial stages would have at least $50 million in revenues." *Id.* ¶ 16. Spector and Dixon, on behalf of the TL Defendants, represented to the Reohr partners that the businesses to be acquired would all be profitable companies engaged in the same business as Reohr. *Id.* ¶ 17. They further represented that, following their investment in Reohr, Reohr's business would remain substantially unchanged. *Id.*

However, Plaintiff alleges that the TL Defendants actually planned to transform Reohr into an electronic business consulting firm that could be quickly "flipped" for a giant profit, given the "public euphoria" surrounding Internet commerce in the late 1990s. *Id.* ¶ 19, 52. Defendants failed to disclose, at any time, that they intended to take extraordinary risks and assume high amounts of debt in managing the new entity. *Id.* ¶ 19.

In anticipation of the Reohr merger, TL purchased an entity called Global Consulting Group ("Global"). *Id.* ¶ 21. Spector and Dixon represented to the Reohr partners that Global was a stable company in the same line of business as Reohr. The merger was completed in October 1997, but with significantly different equity allocations than Defendants had led the Reohr partners to believe. *Id.* ¶ 27. Rice, a new investor, purchased a substantial amount of equity, allowing TL to limit its investment to about 20% of the new company. Also, the Reohr partners were paid for their shares not out of TL capital, as the Reohr partners had been led to expect, but with funds borrowed from PNC bank, which saddled Broadreach with debt. *Id.*

Defendants thereafter pressured Plaintiff to resign his Broadreach management and Board positions, so that he would not be in a position to oppose their risky plans for the company. In February 1998, Dixon telephoned Plaintiff and assured him that Broadreach was doing well, except in the marketing area. ¶ 43. Dixon also stated that Plaintiff's employment at the company was not "working out." *Id.* Plaintiff resigned his management position at Broadreach based on this discussion with Dixon, as well as Dixon's assertion that the three Reohr partners would continue to hold Broadreach board seats. *Id.* Yet, throughout 1998, Plaintiff was excluded from Board meetings and not provided with financial records. *Id.* ¶ 46. Dixon repeatedly asked for Plaintiff's Board resignation and exerted "intolerable pressure and indignities" on Plaintiff until he finally left the Board. *Id.*

In late January 1999, Dixon sent to Plaintiff, in the U.S. mails, a general release, which would have absolved Defendants of liability related to Plaintiff's separation, except as provided by contract. Plaintiff refused to sign the release. ¶ 48. On February 1, 1999, Dixon sent a letter to Plaintiff, also via the mails, accepting his resignation from the Board and advising him that he would keep Plaintiff appraised of Broadreach's performance. ¶ 49.

Dixon, with the assistance of Board members placed on the Board by TL and Rice, began to mask Broadreach as an e-commerce company, in order to make the

company more attractive to buyers. *Id.* ¶¶ 50–51. To carry out this "illusion," Defendants hired expensive executives, gave inexperienced workers management titles, misrepresented to potential buyers that Broadreach had expertise in areas that it did not, and even sold off the company's staffing business. *Id.* ¶¶ 52–53, 59. In the fall of 1999, the company "directed a stream of misleading communications regarding the nature of its business to potential buyers." *Id.* ¶ 53. The Marant Group briefly showed interest in acquiring Broadreach, but rejected the inflated price when it learned of Broadreach's lack of e-business experience. *Id.* ¶ 54.

At an unspecified point in 1999, Dixon offered to buy Plaintiff's shares. When Plaintiff inquired of Kurt Keene of the Rice firm as to Broadreach's prospects, Keene failed to disclose information regarding the company's high debts and other reasons for concern, causing Plaintiff not to sell. *Id.* ¶ 58. By the second quarter of 2000, as a result of Defendants' scheme and the enormous bank debts taken on to finance the "charade," Broadreach was experiencing negative earnings. *Id.* ¶ 60. On December 19, 2000, Dixon, on behalf of Broadreach, sent a notice through the U.S. mails seeking additional funding from Plaintiff and other shareholders. ¶ 61. No investors were willing. On January 1, 2001, Broadreach announced by press release and over the wires that the company would "spin off" its staffing work into a new entity called LiquidHub. ¶ 62. On July 23, 2001, Broadreach sent to Plaintiff, via U.S. mail, notice of a Special Meeting of Shareholders, for the purpose

of authorizing the sale of all or substantially all of the company's assets. *Id.* ¶ 64. In August 2001, Plaintiff gave Broadreach notice that he intended to exercise dissenters' rights. *Id.* ¶ 65. Though Plaintiff repeatedly requested access to Broadreach's books, the Board stonewalled. *Id.* ¶ 70.

On August 3, 2001, Citizens Bank of Massachusetts ("Citizens"), a creditor of Broadreach, notified Broadreach that it was in default and that Citizens would exercise its UCC rights, obtain all Broadreach collateral securing the defaulted loan, and transfer those assets to Vector esp, Inc. ("Vector"). *Id.* ¶ 68. Upon acknowledging that it had no rights as to the collateral securing the Citizens indebtedness, Broadreach conveyed to Vector all of its remaining assets. *Id.* ¶ 70. Thus, Broadreach ceased to exist. *Id.* ¶ 72. Plaintiff alleges that the Board entered into the Citizens/Vector transaction "in hopes that Broadreach would no longer constitute a viable entity for purposes either of derivative litigation or of any dissenters' rights proceedings."[3] *Id.* Plaintiff further claims that, because Defendants denied him access to company financial records and fed him misinformation through their counsel, he could not have learned until late 2000, at the earliest, that his Broadreach stock had sustained a loss.

## III. Sufficiency of the Complaint

In Counts I, II and III, Plaintiff asserts civil RICO violations pursuant to 18 U.S.C. §§ 1962(b), (c) and (d), respectively.[4]

---

3. Plaintiff alleges in his Response to the motion to dismiss that the Citizens/Vector transaction, which led to the demise of Broadreach, "obviously" involved the mails or wires, though Plaintiff admits he has no details. Plaintiff's Response to Motion to Dismiss at 15.

4. Counts IV and V assert state law claims of common law fraud and negligent misrepresentation. In their motion to dismiss, Defendants do not dispute that these two counts assert causes of action upon which relief may be granted, assuming this Court has subject matter jurisdiction.

(b) It shall be unlawful for any person *through a pattern of racketeering activity* or through collection of an unlawful debt to *acquire or maintain,* directly or indirectly, any interest in or *control of any enterprise* which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person *employed by or associated with any enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, *to conduct or participate,* directly or indirectly, in the conduct of such enterprise's affairs *through a pattern of racketeering activity* or collection of unlawful debt.

(d) It shall be unlawful for any person *to conspire* to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962 (emphasis added). To successfully plead a civil RICO violation under any of these three subsections, a plaintiff must allege either "a pattern of racketeering activity" or the "collection of an unlawful debt." *See H.J. Inc. v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 232, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 154, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ("[t]he heart of any RICO complaint is the allegation of a pattern of racketeering.").

Racketeering activity includes "any act which is indictable under ... title 18 ... section 1341 (relating to mail fraud) [or] section 1343 (relating to wire fraud)." [5] 18 U.S.C. § 1961(1)(B). A pattern of racketeering activity "requires at least two acts of racketeering activity," i.e. two acts of mail or wire fraud, within ten years. 18 U.S.C. § 1961(5). However, "while two acts are necessary, they may not be sufficient." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The Supreme Court, noting that a pattern cannot be formed by "sporadic activity," has established a two-prong framework for considering the existence of a pattern. *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. 2893. Proof of a pattern requires both "a relationship" among the predicate acts and a showing that the acts "amount to or pose a threat of continued criminal activity." *Id.*

The "relatedness" prong requires that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id. (quoting* Organized Crime Control Act of 1970, 18 U.S.C. § 3575, et seq. (partially repealed)); *Tabas v. Tabas,* 47 F.3d 1280, 1292 (3d Cir.1995). The "continuity" prong is "both a closed- and open-ended concept, referring either to a

**5.** The mail and wire fraud statutes provide:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... or knowingly causes to be delivered by mail . . any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.
18 U.S.C. § 1341.

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.
18 U.S.C. § 1343.

closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." [6] *Tabas*, 47 F.3d at 1292 (*quoting H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. 2893). Thus, a short-term fraudulent scheme posing no threat of future criminal conduct cannot satisfy the continuity requirement. *See Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1412 (3d Cir.1991). One way to show continuity is to establish that the predicate acts of racketeering "are part of an ongoing entity's regular way of doing business." *Id.* (*quoting H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893).

The Third Circuit has explained that, in assessing the continuity of criminal activity in a particular case, "it is often helpful to examine the actions which are alleged to form the basis of criminal activity." *Id.* at 1413. Plaintiff alleges that Defendants committed various predicate acts of mail fraud and wire fraud. Complaint ¶ 78. The mail fraud statute, 18 U.S.C. § 1341, applies only where the defendant uses the U.S. mails as "part of the execution" of a fraudulent scheme. *Schmuck v. United States*, 489 U.S. 705, 710, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). The wire fraud statute, 18 U.S.C. § 1343, "is identical to the mail fraud statute except it speaks of communications transmitted by wire," i.e. telephone, radio, or television, and does not apply to intrastate communications. *United States v. Frey*, 42 F.3d 795, 797 (3d Cir.1994). The Court of Appeals has noted that "cases construing the mail fraud statute are applicable to the wire fraud statute as well." *Id.* at 797 n. 2 (*quoting United States v. Tarnopol*, 561 F.2d 466, 475 (3d Cir.1977)). To support

a mail or wire fraud conviction, a transmission "must further the scheme to defraud or be incident to an essential part of that scheme." *Id.* at 798. The "scheme" need not be fraudulent on its face, but "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr Packages*, 926 F.2d at 1415 (*quoting United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir.1978)).

This Court is able to discern approximately a dozen uses of the mails or wires by Defendants, alleged to have occurred over a five year period. These include Spector's [7] mailing to the Reohr partners confirmations regarding Defendants' intention to combine several successful staffing companies, *id.* ¶ 16; Dixon's call assuring the Reohr partners they would each have a seat on the Broadreach board, *id.* ¶ 34; Dixon's faxing of unspecified "documents related to the completion of the merger," *id.;* Dixon's call advising Plaintiff that his employment at the company was not "working out," and assuring him that the Reohr partners would continue to hold Broadreach board seats, *id.* ¶ 43; Dixon's sending to Plaintiff a release, which would have absolved Broadreach of liability related to the separation, *id.* ¶ 48; Dixon's letter accepting Plaintiff's resignation and advising him that he would keep Plaintiff appraised of Broadreach's performance, *id.* ¶ 49; Broadreach's "stream of misleading communications regarding the nature of its business to potential buyers," *id.* ¶ 53; Dixon's notice seeking additional funding from Plaintiff and other shareholders, *id.* ¶ 61; and Broadreach's notice of a Special

---

**6.** Though Plaintiff does not specifically refer to an "open" or "closed" period of racketeering conduct, this Court may reasonably infer that only a closed period is alleged, inasmuch as Broadreach, as an enterprise, has ceased to exist.

**7.** Defendant Spector is not identified as a defendant to Count I, which is now pending only against the TL Defendants and Dixon. However, Spector is a defendant to Counts II and III.

Meeting of Shareholders, for the purpose of authorizing the sale of all or substantially all of the company's assets. *Id.* ¶ 64.

 Though, in Count I, Plaintiff vaguely refers to acts of mail and wire fraud, "described with greater particularity hereinabove," Complaint ¶ 78, he fails to explain specifically how each of these acts "further[ed] the scheme to defraud or [was] incident to an essential part of that scheme." *Frey*, 42 F.3d at 798. Similar language is used in Count II (¶ 88) and Count III (¶ 94). The Court believes that RICO requires specifics in these charging paragraphs, rather than the mere incorporation of the multitude of facts alleged in the prior 37 pages of the Complaint. Nor does the pleading, as written, satisfactorily tie each Defendant's alleged individual or joint conduct to "fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr Packages*, 926 F.2d at 1415. This Court is mindful that, in this RICO case, as in an antitrust case, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). Yet, even viewing together the many "dots" of fraud alleged, Plaintiff's Complaint, particularly the charging paragraphs of Counts I, II and III, fails to connect those dots in the language and particulars of RICO.

Despite its extraordinary length, the present Complaint does not specifically allege how each of these acts constitutes a part of "a pattern of racketeering activity." 18 U.S.C. §§ 1962. Accordingly, Plaintiff has failed to properly state a civil RICO claim.

## IV. PSLRA Defense

A separate issue raised in the briefings concerns section 107 of the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (1995). That section prevents a RICO plaintiff from relying on predicate acts "that would have been actionable as fraud in the purchase or sale of securities to establish a [civil RICO] violation." 18 U.S.C. § 1964(c). *See Burton v. Ken–Crest Services, Inc.*, 127 F.Supp.2d 673, 675 (E.D.Pa.2001) ("[PSLRA] eliminated conduct actionable as securities fraud from qualifying as a predicate act under RICO.").

Section 10(b) of the Securities Exchange Act of 1934 provides

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act [15 USCS § 78c note]), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Securities and Exchange Commission Rule 10b–5 provides

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any

facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

■ These two provisions concern only conduct undertaken "in connection with the purchase or sale" of securities. Though Defendants contend at great length that Plaintiff's claims give rise to a securities fraud cause of action, Plaintiff does not allege that he purchased or sold any securities, and Defendants fail to identify any tangible relationship between the alleged predicate acts and any sale or purchase of securities by Plaintiff. Notably, Defendant Dixon's alleged notice via the U.S. mails seeking additional funding from Plaintiff and other shareholders, *id.* ¶ 61, did not, according to the Complaint, induce "new investments." *Cf. Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,* 189 F.3d 321, 330 (3d Cir.1999). Accordingly, Defendants' PSLRA argument fails. If Defendants wish to assert the purchase or sale of securities by Plaintiff, they may do so by a properly supported motion for summary judgment.

## V. Leave to Amend

Leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Grant of leave to amend is within the discretion of the district court. *See Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 330, 91

S.Ct. 795, 28 L.Ed.2d 77 (1971). Prejudice to the non-moving party "is the touchstone for the denial of an amendment." *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir. 1993) (*quoting Cornell & Co. v. Occupational Safety & Health Rev. Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)). In the absence of substantial prejudice, "denial instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." *Id.* None of these reasons for denial are presented in the instant case. Plaintiff's Complaint details a scheme to defraud that satisfies the normal federal pleading standards. The Court grants leave to amend because it would be unfair to dismiss the Complaint with prejudice only because Plaintiff has not satisfied the peculiar pleading requirements of RICO. Accordingly, Plaintiff shall have twenty days from the date of this Order, within which to file an amended complaint.

## VI. RICO Case Statement

The Amended Complaint should include or be accompanied by a "RICO Case Statement" which this Court will consider as part of the amended pleading. *See, e.g., Glessner v. Kenny,* 952 F.2d 702, 712 n. 9 (3d Cir.1991) ("Courts may consider the RICO case statements in assessing whether plaintiffs' RICO claims should be dismissed."), *overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 260 (3d Cir.1995); *Heintz Corp. v. Electro Methods,* No. 94–cv–6916, 1995 WL 405721 at *1, 1995 U.S. Dist. LEXIS 8346, at *3 (E.D. Pa. June 15, 1995) (Padova, J.) (accepting facts drawn from Complaint and RICO Case Statement as true in considering motion to dismiss); *Greek Radio Network of America, Inc. v. Vlasopoulos,* 731 F.Supp. 1227, 1234 n. 12 (E.D.Pa.1990) (O'Neill, J.) (referring to

**680**

Complaint and RICO Case Statement collectively as "the Complaint"). *See also* Judge O'Neill's recent decision in *Chovanes v. Thoroughbred Racing Assoc.*, 2001 WL 43780, 2001 U.S. Dist. LEXIS 375 (E.D.Pa.2001).

The RICO Case Statement to be filed should include the following, in substance:

i. As to each Defendant in each RICO Count, state the alleged misconduct and basis of liability of each Defendant.

ii. As to the racketeering activity alleged under each RICO Count, include the following:

a. List each predicate act which Plaintiff alleges constitutes the RICO violation, including such specifics as names, dates and types of communications or acts.

b. Describe how each predicate act is fraudulent and/or part of a pattern of racketeering activity.

c. State how the alleged predicate acts relate to each other as part of a common plan.

iii. Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.

iv. Describe how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.

v. Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.

The Court finds that Plaintiff has adequately alleged an enterprise, i.e., Broadreach, and the RICO Case Statement need not go into any further details on that issue. The Court also finds that Plaintiff has adequately alleged damages and rejects Defendants' assertion that the damages sought are of the type that would only be recoverable in a derivative claim.

**ORDER**

AND NOW, this ___ day of October, 2002, it is hereby ORDERED that the Motion to Dismiss the Complaint by Defendants TL Ventures, TL Ventures III L.P., TL Ventures III Offshore L.P., TL Ventures III LLC, TL Ventures III Interfund L.P., TL Ventures Management L.P., Arthur Spector and James Dixon is GRANTED, with leave granted to Plaintiff to file an Amended Complaint within twenty days of the date of this Order, which shall contain a RICO Case Statement as described in the foregoing Memorandum. In addition, Plaintiff shall file a blacklined version of paragraphs 1–74 of the Complaint, showing any changes made to these paragraphs.

Defendants shall file a responsive pleading to any Amended Complaint within twenty days after service of the Amended Complaint.